# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5542 | **DATE** | 3/27/2003 |
| **CASE TITLE** | George Jackson vs. City of Chicago, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/10/2003 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The Court grants the Union's motion for summary judgment (Doc. No. 17-1). The City's motion for summary judgment (Doc. No. 21-1) is granted with respect to the retaliation claim and denied with respect to Jackson's claims of racial discrimination.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 2 8 2003 | date docketed | 65 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 3/27/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | CLERK, U.S. DISTRICT COURT  03 MAR 27 PM 4: 51  FILED-ED-10  Date/time received in central Clerk's Office | ETV mailing deputy initials | |

GEORGE JACKSON,               )
                              )
        Plaintiff,            )
                              )
    v.                        )      No. 01 C 5542
                              )
CITY OF CHICAGO and CHICAGO   )      Judge Rebecca R. Pallmeyer
AND NORTHEAST ILLINOIS DISTRICT )
COUNCIL OF CARPENTERS LOCAL13, )
                              )
        Defendants.           )

## MEMORANDUM OPINION AND ORDER

Plaintiff George Jackson ("Jackson") works for the City of Chicago's Department of Transportation ("DOT") as a carpenter. On July 17, 2001, he brought suit against Defendant City of Chicago ("City") and the Chicago and Northeast Illinois District Council United Brotherhood of Carpenters and Joiners of America, Local 13[1] ("Union"), alleging race discrimination and retaliation in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Specifically, Jackson asserts that the City discriminated against him on the basis of race (he is African-American) by failing to promote him in 1997 and again in 2000. He alleges that the Union also discriminated against him on the basis of race by failing to prosecute a grievance filed in response to his non-promotion in 2000. Jackson finally claims that the City's 2000 employment decision constituted an unlawful retaliation against him because of an earlier claim of race discrimination he filed against the City.

---

[1] In its Memorandum of Law in Support of Summary Judgment, the Union expresses uncertainty as to the actual entity Jackson has sued. Chicago and Northeast Illinois District Council of Carpenters is an unincorporated, voluntary, not-for-profit association doing business in Illinois, while Local 13 is one of the Chicago affiliates of the Chicago and Northeast Illinois District Council of Carpenters. (Union's Memorandum of Law, at 1, n. 1.) Because the court grants the Union's motion for summary judgment, it need not resolve this issue and assumes that Jackson's case is dismissed as to both entities. The court notes that the record suggests that Jackson is not actually a member of Local 13, but rather a member of Local 62. (Hooker Dep. at 14, Ex. 14 to Pl.'s 56.1.) Neither party has alleged that this bears on the outcome of the case, however, and therefore the court assumes it does not.

George Jackson is an African-American man who has been employed by the City of Chicago as a carpenter since March 13, 1987. (Pl.'s 56.1. ¶¶ 1,2.) He was hired in the City's Department of Public Works, which subsequently was divided into two departments: the Department of Transportation ("DOT") and Department of General Services ("DGS"). (*Id.* ¶ 2.) He is currently a carpenter with the DOT. He came to the City after working for 12 years at the Chicago Housing Authority ("CHA"). In 1997, DGS posted a job opening for Foreman of carpenters, which Jackson applied for, and in 1999, DOT posted two job openings for General Foreman of carpenters, and Jackson submitted applications for these openings as well. At the time of these applications, Jackson had over 30 years experience as a carpenter as well as substantial formal training and education. He was not chosen for either position.

I.     **1997 Department of General Services Foreman Position**[3]

The Job Opportunity Bid Announcement posted in March 1997 for Foreman of Carpenters stated that the minimum qualifications for the position were: "Successful completion of an approved apprentice training program in carpentry supplemented by a minimum of two years of journeyman

---

[2]     The court compiled the facts for this section from the parties' statements of material facts and attached exhibits. Local Rule 56.1 replaced the earlier Rule 12(m) and Rule 12(n); Plaintiff's statement of facts, which he has labeled with the older nomenclature, will be referred to in this opinion as a 56.1(b)(3)(B) statement (the parties' statements will hereinafter be referred to as "Pl.'s 56.1," "City's 56.1," and "Union's 56.1"). Defendant has made a number of objections to assertions in Jackson's 56.1 Statement. Some of these objections are valid. As explained repeatedly, statements of material fact must contain allegations of fact and not legal conclusions; must include material facts; and must be supported by admissible (non-hearsay) evidence. *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). Portions of Jackson's 56.1 Statement fail these tests. Where Jackson's assertions are unsupported, the court has disregarded them.

[3]     At some point after Jackson began working for the City, the Public Works Department was split into two new departments – General Services and Transportation – and all Public Works employees were reassigned to one of the two units. City employees are allowed to apply for any position in any department within the City for which they are qualified. Jackson initially worked for Public Works, then the Department of General Services, and has been employed by the Department of Transportation since 1994. (Jackson's Bid Application of May 19, 1999, Ex. 4 to Pl.'s 56.1.)

carpentry experience."[4] (Ex. 30 to Pl.'s 56.1.) Job duties listed included ordering materials and equipment, coordinating subordinates' work, and ability reading blueprints. (Id.) Ten people submitted bids for this position, including Jackson. (City's 56.1 ¶ 4.) Of these ten applicants, nine were interviewed by Frank Scalise, General Superintendent of Trades, and Jimmy Jones, General Foreman of Trades. (Scalise Aff. ¶ 4, Ex. C to City's 56.1.) The interviewers asked each candidate five questions regarding basic carpentry skills.[5] (Scalise Aff. ¶ 5, Ex. C to City's 56.1.) Scalise and Jones rated each candidate in four categories: previous job experience; previous supervisory experience; previous job performance in a City department; and written and oral skills. (Hiring Criteria Rating Form, Ex. C to City's 56.1.) Scalise and Jones each individually completed a Department of Personnel Hiring Criteria Rating Form, on which they assigned the candidates a numerical score, on a scale of one to five (one being the lowest and five the highest) in each of the individual categories. (Id.) Plaintiff received the second lowest score of the nine candidates based on the interview.[6] (City's 56.1 ¶ 4.)

Michael Capecci was selected for the promotion on June 20, 1997. (City's 56.1 ¶ 5.) Capecci had been working for the City as a carpenter since 1992. (Capecci Dep. at 6, Ex. 16 to Pl.'s 56.1.) Other than a one-semester course after high school that he could not clearly recall, Capecci had received no formal education or training in carpentry. (Capecci Dep. at 20-21, Ex. 16 to Pl.'s 56.1.) He never attended trade school, nor did he ever participate in an apprenticeship program, but he did obtain a union card, which meant that he was able to become a union member (a requirement for the job) even though he had not been through formal training as an apprentice

---

[4]    In order to successfully complete an approved apprenticeship program, an individual must first complete a four year qualified training program. An apprentice must be enrolled in a trade school and complete a pre-apprenticeship program. (Pl.'s 56.1 ¶ 15.)

[5]    Neither the questions asked nor the candidates' answers are in the record.

[6]    The City does not explain how the interview score factored into the other four categories described above. The court surmises the interview score may have fallen under category four, oral and written skills. In any event, both Scalise and Jones noted on their evaluation forms that Jackson answered two out of the five interview questions incorrectly. (Attachment 3 to Scalise Aff., Ex. C to City's 56.1.)

3

or in a trade school. (*Id.* at 18-19, 21-22, Capecci Bid Application, Ex. 36 to Pl.'s 56.1, City's Resp. to Pl.'s 56.1 ¶ 21.)

The record is not entirely clear regarding Capecci's prior work experience. Before moving over to the City, he worked as a carpenter for a company called T & T Construction, but there is conflicting evidence regarding the length of his tenure. During his deposition, Capecci stated that he worked at T & T for approximately four years, and that for the last two years of his tenure there, he supervised fellow carpenters. (*Id.* at 31, 32.) During a 1999 arbitration hearing, however, Capecci testified that he could not recall whether he began working with T & T in September 1990 or February 1989 and acknowledged that the Personnel Data Form he completed in 1992 when applying to work for the City reflects that he began working for T & T in September 1990, only two years earlier. (Capecci's Arb. Testimony at 121-22, lines 10-28; Ex. S to City's Resp. to Pl.'s 56.1 ¶ 36.) Capecci's position at T & T was the first job in which he was required to read blueprints, but his work assignments there did not include ordering materials or equipment, nor did it involve coordination of subordinate employees' work. (Capecci Dep. at 32, 35-37.)

The City contends that Jackson did not have the two years of supervisory experience necessary to be a Foreman. (Scalise Aff. ¶ 1, Ex. C to City's 56.1.) The job description itself, however, does not include a requirement of two years of supervisory experience. (Job Opportunity Bid Announcement of March 1997, Attached to Scalise Aff., Ex. C to City's 56.1.) At the time of the 1997 bid announcement, Jackson had 26 years of carpentry experience, including 22 years as a journeyman carpenter. (Jackson Aff. ¶ 5, Ex. 12 to Pl.'s 56.1.) Jackson completed a one year pre-apprenticeship program, completed a four year approved apprenticeship program at Washburne Trade School in 1975, and began working as a journeyman carpenter that same year. (*Id.* ¶¶ 1, 4, 6, 39, 41.) He learned to read blueprints as part of his apprenticeship program at Washburne, and while pursuing an Associate's Degree in engineering at Daley Community College, Jackson took a number of classes to further his skills in this area. (*Id.* ¶¶ 3, 11.) Jackson completed his Associate's Degree in 1995. (*Id.* ¶ 3.)

4

Jackson worked for approximately 12 years for the Chicago Housing Authority ("CHA"), serving for over two years in a supervisory position. (*Id.* ¶ 10.) In this role, he organized, assigned, and reviewed the work of subordinate carpenters, supervised carpenters and other workers in the construction trades, determined project requirements, and ordered tools and materials necessary to complete jobs. (*Id.* ¶¶ 6-13.)

Jackson contends that the City "ensured" that Capecci received the promotion by choosing him to "act up" as Foreman on numerous previous occasions. (Pl.'s 56.1 ¶ 99.) "Acting up" is the term used to describe an employee who serves temporarily in a position higher than his own, i.e. a regular carpenter serving as a Foreman, or a Foreman substituting for a General Foreman. (City's 56.1 ¶ 6.) An employee who acts up receives the same pay he would receive if he formally held the higher position. (Pl.'s 56.1 ¶ 107.) The Collective Bargaining Agreement ("CBA") is silent on the filling of temporary vacancies. (Arbitration Opinion and Award regarding selection of Acting General Foreman of June 28, 2001, Union Ex. 14 at 9 to Union's 56.1.)

The City responds that its decision to have an individual act up depends on the needs of the department, including the need for continuity of supervision and record keeping, and the projected length of time the Foreman or General Foreman will be absent. The City further explains that an individual is chosen to act up based upon his own ability, availability, and experience, in light of the other projects he would otherwise be directing. (City's 56.1 ¶ 6.)

Jackson denies that the choice of which employees should act up is based solely on these proffered factors, and claims that the City discriminates against African-Americans by routinely choosing less qualified white employees to act up. (Pl.'s 56.1 ¶ 87, Pl.'s 56.1 Resp. to City ¶ 6.) As evidence, Jackson points out that in more than 15 years with the City, he has only been asked to act up in the Foreman position on approximately 13 occasions (once for four days, once for three days, and then only for one day intervals). (Jackson Dep. at 12-16, Ex. 17 to Pl.'s 56.1.) Furthermore, when Jackson has been appointed to act up, he was not required to supervise anyone, and wound up "watching the tools." (*Id.* at 13.) He did not receive the higher Foreman

salary when he acted up. (*Id.* at 13-14.)

On the other hand, within two years of being hired by the City, Capecci was asked to act up as Foreman. (Capecci Dep. at 13, Ex. 16 to Pl.'s 56.1.) Prior to his selection as Foreman in 1997, he had served as acting Foreman at various times and for various lengths - as long as a couple of months in at least one case. (*Id.* at 9.) Capecci testified during his May 17, 2002 deposition that he currently serves as acting Foreman. (*Id.* at 7.)

Plaintiff submitted additional evidence regarding the City's acting up procedures. Harold Tabor, an African-American Foreman for the City, stated that he has not been asked to act up in positions for which he was qualified while less qualified, white employees with less seniority were given acting up opportunities. (Tabor Aff. ¶ 14, Ex. 61 to Pl.'s 56.1.) Although he is qualified, he has never been asked to act up as General Foreman, and he has been repeatedly passed over for promotion while white employees with less seniority, training and experience have been promoted. (*Id.* ¶¶ 13, 14.) According to Tabor, since Stan Kaderbek became the Commissioner for the Department of Transportation, he has consistently assigned white individuals to act up even where those individuals did not meet the minimum qualifications for the position into which they were promoted. (*Id.* ¶ 15.) Tabor has applied for positions for which he met the minimum qualifications and had more seniority than white applicants, and yet Kaderbek promoted white applicants who had been selected to act up. (*Id.* ¶ 16.)

Mickey R. Grayson, another African-American carpenter for the City, stated that he also has been passed over for acting up opportunities in favor of less qualified white employees with less seniority. (Grayson Aff. ¶ 30, Ex. 35 to Pl.'s 56.1.) Grayson has filed several grievances and EEOC complaints, and an unsuccessful federal lawsuit, arguing that City supervisors routinely select less qualified, less experienced white carpenters to act up in positions when more qualified, more experienced African-American employees with more seniority were also available. (*Id.* ¶ 31.) He stated that in some instances, after a white employee had been acting up for a period, the City then permanently promoted that person into the position. (*Id.*) Grayson claims that when

6

Kaderbek asked Donald "Donny" McCarthy, a white employee, to act up as General Foreman of Carpenters in 1997, Grayson was not invited to fill the position, even though he was more qualified than McCarthy. (*Id.* ¶¶ 34-35.)

## II.     Jackson's 1997 Grievance

On July 22, 1997, Jackson, along with two other rejected African-American applicants for the Foreman position, Wyman Payne and George Webster, filed grievances against the City through the Union under the applicable section of the CBA, claiming that the City had not selected the most qualified individual for the job. (City's 56.1 ¶ 12.) The Union pursued these grievances to arbitration, arguing that all three of the grievants were more qualified than Capecci for the Foreman position. (Union's 56.1 ¶ 10.)

On April 19, 1999, the arbitrator, Peter Meyers, ruled that the City had violated the CBA by promoting Capecci because he was not the most qualified individual for the job, and ordered the City to demote Capecci and promote Webster, whom he deemed to be the most qualified of the three grievants. (City's 56.1 ¶ 13.) Meyers concluded that Capecci did not even meet the minimum qualifications for the Foreman position. (Arbitration Decision of April 19, 1999 at 29, Ex. F to City's 56.1.) Meyers found that Scalise and Jones gave Capecci a higher rating in his interview than they gave the other grievants because Capecci had been allowed to act up in the Foreman position. (*Id.* at 29.) Jackson contends that the arbitrator additionally ruled that he was more qualified than Capecci, but the text of Meyers' ruling states only that "perhaps all three Grievants . . . should have received ratings that were equal to or higher than whatever Capecci received . . ." (*Id.* at 31.) Although Meyers concluded that the ratings system used to choose Capecci was arbitrary, he then applied that same system and determined that Webster should be promoted to the Foreman position. (*Id.* at 12-13, 31-32.) Jackson denies that Webster is more qualified than he is, and suggests his rating was lower than it should have been due to Meyers' consideration of a

disciplinary action the City brought against Jackson in 1994.[7] (Pl.'s Resp. to Union's 56.1 ¶ 13.)

After the arbitrator ruled on the case, the City demoted Capecci back to the position of carpenter. (Capecci Dep. at 13, Ex. 16 to Pl.'s 56.1.) Two weeks later, however, Capecci was asked to serve as acting Foreman, and he held that position until at least May 2002. (*Id.* at 44-45.)

## III. Jackson's 1997 EEOC/IDHR Filings

On September 9, 1997, Plaintiff filed a charge of discrimination against the City on the basis of race with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 21B97806, which was cross filed with the Illinois Department of Human Rights ("IDHR"), Charge No. 1998CF0634. (City's 56.1 ¶ 7.) In his complaint, Jackson alleged that he was denied the promotion to Foreman because of his race, and argued that he was more qualified for the position than Capecci. (City's 56.1 ¶ 7.) On July 13, 1998, the IDHR filed a race discrimination complaint on Jackson's behalf with the Illinois Human Rights Commission ("IHRC"). (City's 56.1 ¶ 8.) On June 14, 2000, the IHRC entered a final decision dismissing Jackson's case with prejudice. (City's 56.1 ¶ 11.) Plaintiff did not appeal the IHRC's dismissal. (*Id.*) On May 21, 2001, the EEOC issued Jackson a notice of his right to sue. (*Id.* ¶ 25.)

## IV. 2000 General Foreman of Carpenters Position

In May 1999, the City posted a Job Opportunity Bid Announcement for the position of General Foreman of Carpenters in the Bureau of Bridges and Transit of the City's Department of Transportation. The bid announcement listed as the minimum qualifications the "completion of an approved carpentry apprentice training program supplemented by three years of progressively responsible journeyman carpentry experience including one year of supervisory experience." (Job Opportunity Bid Announcement, Ex. 22 to Pl.'s 56.1.) Jackson and ten other individuals submitted bids for the position. (City's 56.1 ¶ 16.) Of the eleven applicants, the City deemed nine, including

---

[7] In March 1994, Jackson had an altercation with his then supervisor, Barry Decker, which led to Jackson's suspension from his job without pay for 29 days. (Union's 56.1 ¶ 9.) Jackson argues that disciplinary actions are to be removed from personnel files after one year, but he provides no documentary support for this assertion. (Jackson Aff. ¶ 48, Ex. 12 to Pl.'s 56.1.)

Jackson, eligible to be interviewed. (*Id.* ¶ 17.) At the time of the bid announcement, Jackson had never served as acting General Foreman, nor did he have experience at DOT as a supervising carpenter. (Union's 56.1 ¶ 47, City's 56.1 ¶ 18.)

No one was selected for the position at this time, because the May 1999 bid was cancelled by the City. Jackson received word of the cancellation by letter dated July 6, 1999 from Florence Hooker, Director of Staff Services for the DOT. (Letter from Hooker to Jackson of July 6, 1999, Ex. 43 to Pl.'s 56.1.)

In September 1999, a second Job Opportunity Bid Announcement was posted for the position of General Foreman. (City's 56.1 ¶ 21.) The minimum qualifications listed were: "completion of an approved carpentry apprentice training program or the equivalent combination of training and experience, supplemented by three years of progressively responsible carpentry experience, including one year of supervisory experience." (Job Opportunity Bid Announcement of September 7, 1999, Ex. 23 to Pl.'s 56.1.) Thus, the September 1999 bid announcement amended the May 1999 announcement by dropping the requirement that applicants for the position must have completed an approved carpentry apprentice program, and allowed for equivalent experience to suffice. (*Id.*) Jackson submitted an application for the second General Foreman bid announcement. [8] (Jackson's September 17, 1999 Bid Application, Ex. 5 to Pl.'s 56.1.) The City subsequently cancelled the bid and no individual was selected for the position. (City's 56.1 ¶ 21.) The record does not indicate how Jackson was notified of the City's action.

Section 14.8 of the Collective Bargaining Agreement, which governs the position of General Foreman of Carpenters, requires that qualified bargaining unit employees be given an equal opportunity to bid on jobs declared vacant. In May 2000, the Union and the City agreed to suspend this provision of the agreement for the General Foreman position. [9] (City's 56.1 ¶ 22.) This

---

[8]     The court is unaware of the number of applicants for the second bid announcement.

[9]     Neither party has explained the source of the City or Union's authority to waive the
                                                                         (continued...)

decision was made because the City and Union believed that McCarthy had performed well in the acting position of General Foreman and should be promoted.[10] (*Id.* ¶ 23.)

At the time of his promotion, McCarthy had been employed with the City for approximately seven years. (McCarthy Dep. at 6, Ex. 15 to Pl.'s 56.1.) He began working as a carpenter with the City's Transportation Bureau of Bridges in July 1993, in 1995 became an acting Foreman, and was promoted to Foreman in 1996. (*Id.* at 7.) When the May 1999 bid was posted, McCarthy had been acting up in the position of General Foreman since April 1998. (City's 56.1 ¶ 19, Union's 56.1 ¶ 50.) Prior to his employment with the City, McCarthy never completed an apprenticeship training program. (McCarthy Dep. at 35, Ex. 15 to Pl.'s 56.1.)

Jackson's September 1999 bid reflected that he was a carpenter with the DOT, held an Associate's Degree in engineering from Daley College and had amassed 10 credit hours in engineering from Purdue University. (Jackson's September 17, 1999 Bid Application, Ex. 5 to Pl.'s 56.1.) He also stated on his application that he attended the Washington Trade School from 1971 to 1975, where he studied architectural drafting and blueprint reading. (*Id.*) For 12 years and five months, Jackson worked as a carpenter and superintendent for the Chicago Housing Authority, which included scheduling carpenters, electricians and other workers regarding work to be done, and inspecting time sheets. (*Id.*) His application also reflects almost 12 additional years working for the City, for the Departments of Transportation, General Services, and Public Works, in which Jackson performed a multitude of carpentry tasks. (*Id.*) Jackson indicated on his application that during his tenure at the CHA, he had experience supervising and inspecting the work of other carpenters, had reviewed work plans and blueprints, and had determined manpower and materials to be used for a job. (*Id.*)

---

[9](...continued)
bidding process.

[10]     Kaderbek and Michael Bartello, former DOT Employee Relations Supervisor, both explained McCarthy had been doing a fine job as acting General Foreman. (Bartello Aff. ¶ 9 Ex. D to City's 56.1, Kaderbek Dep. at 15, Ex. L to City's 56.1.)

McCarthy also submitted an application for the position in September 1999, identifying his current title as acting General Foreman. (McCarthy's September 20, 1999 Bid Application, Ex. 7 to Pl.'s 56.1.) His bid stated that he had attended De La Salle High School from 1974 to 1978, and had no formal education past high school. In the space provided for applicants to list trade schools or apprenticeships completed, McCarthy wrote: "10 years as a union carpenter. 10 years as a contractor of the renovation of apartment buildings and of homes." (*Id.*) McCarthy indicated that he worked for approximately 19 years as a real estate carpenter with private companies before joining the City in 1992. (*Id.*) He then spent one year with the Chicago Park District, where he rehabilitated field houses. (*Id.*) His application revealed that for the past six years, he had been working for the City as acting General Foreman of carpenters, which including supervising Foremen and 30 carpenters, setting schedules, assigning work, and determining manpower, materials and equipment needed for jobs.[11] (*Id.*) McCarthy noted that he had reviewed blueprints, work plans and work orders to determine project requirements, estimated labor and materials for jobs, and maintained records and attendance.

Jackson and the Defendants dispute the reasons for the cancellation of each bid announcement, the decision to waive the bidding process altogether, and the ultimate selection of McCarthy for the job. The City contends that the positions were cancelled due to budgetary constraints. (Kaderbek Dep. at 8-9, Ex. 19 to Pl.'s 56.1.) Jackson argues that money was not the driving force, but rather, the City cancelled and then amended the first bid in an effort to lower the minimum qualifications so that its pre-selected candidate, McCarthy, would be eligible for the position. (Pl.'s Resp. to Union's 56.1 ¶ 28.) Florence Hooker, the Director of Staff Services, acknowledged that the bid announcement was not withdrawn due to lack of funding. (Hooker Dep. at 64-65, Ex. 14 to Pl.'s 56.1.) She testified that the bid announcement was amended because McCarthy has been acting up in the position and Kaderbek, Bartello, and Tom Ryan (the Secretary-

---

[11]     On the following page of the application, McCarthy clarified that he had been serving as acting General Foreman for the past 16 months.

Treasurer Business Agent of Local 13) felt he was the most qualified for the position, but he did not meet the minimum requirement of having completed an apprenticeship program. (*Id.* at 23-25.) She testified that Kaderbek, Ryan, and Bartello all confirmed this story with her. (*Id.* at 24-25.) Kaderbek denies speaking with anyone about the promotion after the first bid was cancelled, although Defendants do not dispute the accuracy of Hooker's statement concerning their decision to promote McCarthy. (Kaderbek Dep. at 15-17, Ex. 19 to Pl.'s 56.1.) The Union asserts that it agreed to waive the bidding process because it was clear that McCarthy was the most qualified applicant. (Union's 56.1 ¶ 50.) The Union claims that in agreeing to waive the CBA provision, it was persuaded by the fact that McCarthy had been doing a good job and had no complaints lodged against him during the time he served as acting General Foreman. (*Id.* ¶ 33.)

Although the exact nature of his role in hiring McCarthy is disputed,[12] Kaderbek claims that the most important factor considered in selecting an individual to fill the General Foreman position is the applicant's supervisory experience within the department. (Kaderbek Dep. at 52-55, 72-73, Ex. 19 to Pl.'s 56.1.) He outlined the specific considerations in choosing a General Foreman: (1) whether the applicant has acted up in the General Foreman position, and his past performance in that position, (2) whether the applicant had been a Foreman of Carpenters (or acted up in that position), (3) the applicant's familiarity, skill, or lack thereof, in doing paperwork, and (4) the applicant's past performance in the department over all. (*Id.* at 23-28, 49-50, 72-80.)

Kaderbek denied that acting up is essential to receive a promotion to General Foreman, but he could recall only one instance during the past six years in which a position became open and the employee promoted had not been acting up in that position. (*Id.* at 32, 36.) Moreover, Jackson points out that in a previous deposition for a different case, Kaderbek testified that previous

---

[12]     Kaderbek claims he simply signed the Personnel Action form promoting McCarthy, while McCarthy states that Kaderbek asked him if he wanted the position, and Hooker testified that she spoke with Kaderbek who informed her that the City and the Union had agreed to promote McCarthy. (Kaderbek Dep. at 15, Ex. 19 to Pl.'s 56.1, McCarthy Dep. at 40, Ex. 15 to Pl.'s 56.1., Hooker Dep. at 65, Ex. 14 to Pl.'s 56.1.)

experience in acting up positions was the most important factor in making a promotion decision. (Kaderbek Dep. in *Grayson v. City of Chicago*, No. 97-C-0558, Ex. 20 to Pl.'s 56.1.)[13] Jackson urges that the decision to choose McCarthy to act up and then consequently to promote him to the General Foreman position is an example of the City's pattern of favoring white employees in employment decisions.

## V.    Jackson's 2000 Grievance

After learning that McCarthy had been selected for the General Foreman position, Plaintiff approached Karen Hill, his union steward,[14] and complained that McCarthy was not the most qualified person for the job. (Hill Dep. at 17, Ex. 13 to Pl.'s 56.1.) As is her standard practice, Hill discussed the grievance with Jackson and took it up with Tom Ryan and her Union contact. (*Id.* at 7, 15-16.) Ryan told Hill that the Union had placed McCarthy in the General Foreman position and that he was not going to address Jackson's grievance. (*Id.* at 15-16, 21.) Hill concluded there was nothing more she could do and informed Jackson of the Union's decision.[15] (*Id.*) Notwithstanding Hill's communication, Jackson filed a formal grievance claiming that the City's decision to promote McCarthy violated the CBA. (*Id.* at 18-19, 22.) Hill hand-delivered the grievance to a Union official unknown to the court. (*Id.* at 22.) The exact chronology of events that followed is unclear.

The Union states that Herbert Holzman, the Union's attorney, and business agents of Local 13 reviewed Jackson's 2000 grievance. (Ryan Aff. ¶ 12, Ex. 15 to Union's 56.1; Holzman Aff. ¶¶ 2-12, Ex. 16 to Union's 56.1.) Upon review, the Union determined there was no merit to Jackson's

---

[13]    The City has objected to Plaintiff's reliance on Kaderbek's deposition in the *Grayson* case on hearsay grounds. The objection is overruled. Kaderbek's sworn testimony is an admission by a party-opponent, defined as nonhearsay. *See* FED. R. EVID. 801(d)(2). The fact that Kaderbek gave his deposition in a different lawsuit does not alter this analysis.

[14]    The union steward is a City carpenter who serves as the City employees' liaison to the Union. (Hill Dep. at 6, Ex. 13 to Pl.'s 56.1.)

[15]    Although neither party has clarified the matter, the court assumes that Ryan had the authority to decide on the Union's behalf not to pursue a grievant's claims.

claim for several reasons.[16] First, the Union concluded that McCarthy was the most qualified applicant for the position, and that several of the other applicants were more qualified than Jackson, especially because he did not hold the position of Foreman of Carpenters. (Holzman Aff. ¶ 7; Letter from Holzman to Jackson of November 6, 2000, Ex. 10 to Union's 56.1.) The Union contends it would have been improper to pursue a grievance on behalf of Jackson because he was not even a Foreman when he applied for the General Foreman position. (Holzman Aff. ¶¶ 8, 10; Letter from Holzman to Jackson of November 6, 2000.) Finally, the Union asserts that because it had agreed to waive the CBA's bid requirements in connection with the same promotion, it would have been inconsistent to take up Jackson's case. (Letter from Holzman to Jackson of November 6, 2000.)

It appears that Jackson did not receive notice from the Union declining to pursue his grievance until early 2001, when he met with Michael Sexton, the Union President, and Ryan. (Jackson Dep. at 189-194, Ex. 17 to Pl.'s 56.1.) At this meeting, Sexton delivered a letter dated November 6, 2000, prepared by Holzman, advising Jackson of the Union's decision not to pursue his grievance any further. (Letter from Holzman to Jackson dated November 6, 2000, Ex. 10 to Union's 56.1.) The letter informed Jackson that if he disagreed with the Union's position, he could "file a grievance with the District Council pursuant to Section 29 of the District Council's Bylaws." (Id.) Jackson chose not to do so.

## VI.    Jackson's 2000 EEOC/IDHR Filings

October 19, 2000, Jackson filed a second charge of discrimination against the City with the EEOC and IDHR, alleging that he was denied the 2000 promotion on the basis of his race, and that the City's 2000 decision was in retaliation for his having earlier filed grievances about the 1997 non-promotion. (City's 56.1 ¶ 24.) On April 19, 2001, Plaintiff received a notice of his right to sue from

---

[16]    The Union has not indicated which official made the ultimate decision regarding Jackson's grievance, but Holzman stated that Michael Sexton, President of Carpenters Local 13 asked Holzman to investigate Jackson's grievance and respond in writing to Jackson. (Holzman Aff. ¶ 3, Ex. 16 to Union's 56.1.)

the EEOC, (*Id.* ¶ 25) and on July 17, 2001, Jackson filed a three count Complaint against the City of Chicago and the Union.  Count I alleges race discrimination in the City's decision not to promote him to General Foreman in 2000 in the Union's decision not to pursue his grievance.  Count II alleges that the City discriminated against him on the basis of race when it denied him the 1997 promotion to Foreman.  Count III alleges that the City's 2000 employment decision denying him the promotion constituted an unlawful retaliation.  Both Defendants have filed motions for summary judgment.

## DISCUSSION

### I.    Summary Judgment Standard

A motion for summary judgment will be granted only if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The court must consider the evidence and draw all reasonable inferences in favor of the nonmoving party. *Bennington v. Caterpillar, Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).  The court's function is not to weigh the evidence but to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  The nonmoving party must do more than demonstrate a factual dispute, but must offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County,* 241 F.3d 919, 926 (7th Cir. 2001).  When factual matters are in dispute, the court is "obligated to credit [plaintiff's] version of events over the defendant's." *Hostetler v. Quality Dining,* 218 F.3d 798, 802 (7th Cir. 2000).

### II.    Racial Discrimination Claims Under Title VII

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In this case, Jackson bears the burden of establishing that the City and Union discriminated against him.  He may satisfy this burden in one of two ways.  First, he may proceed under the direct method of proof, offering direct evidence that the defendants

15

actions were based on race. *Stone v. Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). Second, Jackson can defeat summary judgment through the familiar indirect, or *McDonnell Douglas* method of proof. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under either method, summary judgment is inappropriate if Jackson offers evidence from which an inference of discrimination can be drawn. *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1402-03 (7th Cir. 1996).

Jackson has offered no direct evidence of race discrimination with regard to either of the promotion decisions, so the court's analysis will focus on the indirect method. Under the *McDonnell Douglas* framework, Jackson bears the initial burden of establishing a prima facie case of discrimination and must show: (1) that he is a member of a protected class; (2) that he applied for, and was qualified for, an open position; (3) that he was denied that promotion; and (4) that the employer filled the position with an individual outside the protected class who had similar or lesser qualifications. *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir. 1999). If Jackson is successful in making out a prima facie case, the Defendants must demonstrate a legitimate, non-discriminatory reason for their actions. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07 (1993). If they do so, Jackson bears the burden showing that the Defendants' proffered reason is a pretext for their true motivation: race discrimination. *Id.* at 507-08. At every stage of the analysis, however, Jackson retains the ultimate burden of persuasion on the issue of intentional discrimination. *Id.* at 508.

### 1. Race Discrimination Claims Against the City Based on Non-Promotions in 1997 and 2000

Jackson claims that the City discriminated against him on the basis of race when it denied him the promotion to Foreman in 1997 and General Foreman in 2000. The City rests its case on the argument that Jackson fails to meet prong two of the *McDonnell Douglas* test, in other words, the City claims Jackson was not promoted because he was not qualified for either position. The City also argues that even if Jackson were able to make out a prima facie case of racial

16

discrimination, the City can show its decisions not to promote were not pretextual, but rather were based on its honest belief that Jackson was not qualified for the positions.

The issue of whether Jackson satisfies prong two of *McDonnell Douglas* is closely related to the determination of whether the City's proffered reasons are pretextual, and therefore the Court addresses them together. *Cf. Vanasco v. National-Louis University,* 137 F.3d 962, 966 (7th Cir. 1998), quoting *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir. 1996) ("Indeed, we have previously noted that 'in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner.")

Jackson has offered evidence from which a jury could conclude that he was qualified for both the Foreman and General Foreman positions. With respect to the 1997 promotion, Jackson met the minimum requirements listed for each position, he had a long history of work as a carpenter and had long been a union member, and he received formal training at a trade school as well as an advanced degree. The City's contention that he was not qualified for the position is not supported by the record.

Determining whether Jackson was qualified for the 2000 General Foreman position is a bit more difficult. Since the City and Union waived the bidding process, there were apparently no published minimum requirements for the job, and Defendants have not explained what criteria were actually used. The court will therefore presume that the qualifications listed in the September 1999 bid announcement represent the minimum requirements for the General Foreman position. Thus, in order to meet the second prong, Jackson must present evidence that he completed an approved carpentry apprentice training program or the equivalent, supplemented by three years of progressively responsible carpentry experience, including one year of supervisory experience. (September 7, 1999 Job Opportunity Bid Announcement, Ex. 23 to Pl.'s 56.1.)

Jackson has offered evidence that he met these requirements. He attended a trade school,

has well over three years of carpentry experience, and served for at least two years as a supervisor with the CHA. Notably, there is nothing in the Bid Announcement which indicates that applicants must be Foremen, or must have served as acting General Foremen. Furthermore, the City's indication to Jackson that he was eligible to interview for the position bolsters Jackson's argument that he was qualified. The City points out that being eligible to interview does not necessarily mean he was qualified for the job, but has not explained why it would invite a candidate who does not meet minimum qualifications to interview for the job. At this stage in the proceedings the court must view the evidence in the light most favorable to Jackson, and doing so persuades the court that he has met his burden of showing he was qualified for the position.

The City also contends that Jackson did not actually apply for the 2000 position, an argument the court finds to be without merit. First, it is unclear whether Jackson could have applied for the position, since there was no bid announcement posted. Second, Jackson submitted bids for both the May and September 1999 announcements, which the record indicates were precursors to the position McCarthy eventually filled. On both occasions, the City withdrew the bid announcements, and subsequently agreed with the Union to waive the bidding process altogether. Failure to submit a formal application for a job opening will not bar a Title VII plaintiff from establishing a prima facie case of failure to promote, as long as the plaintiff made every reasonable attempt to convey his interest in the job to his employer. *Cones v. Shalala*, 199 F.3d 512, 517 (D.C. Cir. 2000); *E.E.O.C. v. Metal Services Co.*, 892 F.2d 341, 348 (3d Cir. 1990). *See also Taylor v. Canteen Corp.*, 69 F.3d 773, 781 (7th Cir. 1995) (citations omitted) ("our case law supports the view that [plaintiff] should not be penalized for failing to apply for a specific job as long as the record suggests, as a reasonable inference, that he would have applied for specific positions had he known of their availability"). For these reasons, the court concludes that Jackson has met the second *McDonnell Douglas* element with respect to Counts I and II against the City. For the same reasons, Jackson has demonstrated that a dispute exists regarding whether the City's reason for denying him the promotions are pretextual. *Essex v. United Parcel Service, Inc.*, 111 F.3d

1304, 1310 (7th Cir. 1997).

Notably, the City does not argue that Jackson does not meet prong four of the *McDonnell Douglas* test, but this is the element that actually provides the greatest challenge to Jackson in proving a prima facie case. In *Grayson v. City of Chicago*, 317 F.3d 745, 749 (7th Cir. 2003), our Court of Appeals noted in a factually similar case that "persons who do not have the same or equivalent positions are not similarly situated with respect to a potential promotion." The Seventh Circuit rejected plaintiff's argument that he was as qualified as the individuals who filled the positions of General Foreman of Carpenters and General Foreman of Trades, because the City argued that the successful candidates had been acting in those positions for years, and that was the reason they were chosen. *Id.* The court noted that the plaintiff in *Grayson* did not show that he had held equivalently demanding positions or had job experience comparable to the successful applicants. *Id.*

While this court is not aware of all the facts in *Grayson*, the record here indicates that there is a factual dispute about whether Jackson was as qualified as Capecci and McCarthy for the positions of Foreman and General Foreman of Carpenters respectively. With respect to the Foreman job, the arbitrator's decision is evidence that Capecci did not meet the minimum requirements for the position, indicating that Jackson may have been at least equally qualified. The City argues that Capecci had more supervisory experience than Jackson, but significantly, supervisory experience was not even listed as a minimum requirement for the Foreman position in the 1997 bid announcement. Assuming that such experience was required, there is still a dispute as to whether Capecci had more supervisory experience than Jackson. Based on the evidence in the record, a jury could conclude that Capecci only worked at T & T for approximately two years, and thus did not have two full years of supervisory experience when he went to work for the City in 1992. Jackson had two years of supervisory experience at the CHA. With respect to the 2000 job application, based on their 1999 applications, a jury could conclude that Jackson's job experience was substantial enough for him to be considered as qualified as McCarthy for the

General Foreman position.

As in *Grayson,* the City here makes much of the fact that Capecci and McCarthy gained relevant experience as acting Foreman and General Foreman respectively. The Seventh Circuit recognized this experience as a legitimate reason for the City's decision not to promote the plaintiff in *Grayson.* 317 F.3d at 749. The court is nevertheless troubled by evidence in this record that calls the City's acting up procedures into question. Capecci was selected to act up after less than two years of working for the City, and McCarthy was first promoted to acting Foreman after only two years with the City, and then to acting General Foreman after two years as a permanent Foreman. After more than 15 years with the City, Jackson has only acted up on rare occasions, for short periods of time, and has not been given supervisory responsibility. Particularly troublesome, in this context, is the fact that only a few days after an arbitrator determined that Capecci was not qualified for the Foreman position, he was reinstated as acting Foreman and has held that position ever since. In this court's view, this evidence suggests that the City treated Capecci, who arguably had less experience, more favorably than Jackson. *See Troupe v. May Department Store Co.,* 20 F.3d 734, 736 (7th Cir. 1994) (evidence that employees similarly situated to plaintiff except for the protected characteristic received more favorable treatment is enough to support a judgment for plaintiff). Similarly, McCarthy was chosen for General Foreman the position because he had been doing a fine job as acting General Foreman, an opportunity Jackson contends was not given to him.

The City argues that the court should not consider acting up procedures because Jackson has not brought a separate claim of racial discrimination with regard to this issue. Again, the *Grayson* decision, where the Seventh Circuit refused to consider the issue, offers some support for the City's argument. 317 F.3d at 751. In that case, however, the Court of Appeals observed that the plaintiff's briefs asked the court to consider a *hypothetical:* "What if the acting position assignments were based on experience gained through interim assignments which were in turn made on a discriminatory basis?" *Id.* Here, Jackson does not pose a hypothetical to the court; he

directly alleges that City officials make acting up decisions on the basis of race, and claims that this is the reason Jackson has been repeatedly passed over for promotions. Furthermore, the Seventh Circuit noted in *Grayson* that the plaintiff had waived the argument about acting up by not raising it in the District Court; here, Jackson has plainly not waived the issue. *Id.*

In the court's view, the City's own defense makes the award of acting up positions relevant. The City points out that Capecci had been acting as Foreman on a regular basis from December 1993 to January 1997, and that McCarthy had been acting as General Foreman since April 1998. (City's Memorandum of Law in Support of its Motion for Summary Judgment at 1-3.) In fact, in explaining why Jackson was not qualified for these positions, the City stated "Jackson had not acted up on a regular basis in the position," further indicating that this experience was relevant to the City's decision to promote Capecci and McCarthy. (*Id.* at 2, 3.) Kaderbek's deposition testimony also indicates the important role acting up plays in determining whether an employee will receive a promotion.

If race played a role in the City's decisions about acting up, then it indirectly played a role in the City's decisions to promote Capecci and McCarthy. The court is unwilling to permit the City to argue first that Capecci and McCarthy were more qualified because they had acted up, and then deny that the issue is relevant to this case. The acting up decisions bear directly on the City's ultimate promotion decisions and the court is suspicious that race may well have played a role in the decisions to promote Capecci and McCarthy to acting positions. The City bears the burden of showing that there are no disputes of fact on this issue, and the court concludes it has not met that burden here. Its motion for summary judgment on Counts I and II is, therefore, denied.

## 2.    Jackson's Claim of Racial Discrimination Against the Union

Jackson alleges that the Union discriminated against him on the basis of race in its handling of his 2000 grievance filed in response to the promotion of McCarthy as General Foreman. As with Jackson's claims against the City, the *McDonnell Douglas* test applies to his claim against the Union. Jackson must prove (1) that he belongs to a racial minority, (2) that he requested action

by the union, (3) that despite the propriety of his request he was refused, and (4) the union assisted members of a different race who made similar requests. *Movement for Opportunity and Equality v. General Motors Corp.,* 622 F.2d 1235, 1255 (7th Cir. 1980).

The Union claims that Jackson's claim must fail because he was not qualified for the position, that is, that Jackson can not meet his burden on prong three. For the reasons explained in connection with the City's motion, however, the court concludes Jackson has presented facts sufficient for a jury to conclude that his grievance had merit. There is no question that the Union refused to pursue his grievance, and Jackson has set forth evidence from which a jury could conclude that he was equally or more qualified for the position than McCarthy. Therefore prong three is met.

Prong four, however, poses the greatest difficulty for Jackson. The court fails to find any evidence in the record that the grievances of similarly situated white employees were treated differently than Jackson's. *Donaldson v. Taylor Products Division of Tecumseh Products Co.,* 620 F.2d 155, 159 (7th Cir. 1980). Although the issue of who was chosen to act up in the position as General Foreman is relevant to Jackson's claim against the City, there is no evidence suggesting that the Union plays a role in choosing people to act up. Therefore, any evidence that race may play a factor in these decisions is not relevant to Jackson's claim against the Union.

Additionally, Jackson's argument that the Union treated him inconsistently, and therefore discriminated against him, is without merit. The Union pursued Jackson's 1997 grievance, and argued that he was more qualified than Capecci for the position of Foreman. In 2000, the Union disagreed with Jackson's claim that he was more qualified that McCarthy to be General Foreman. The court is not convinced this treatment was inconsistent; Jackson applied for two different positions, and competed against two different individuals. It is certainly conceivable that the Union had legitimate reasons for choosing not to pursue Jackson's 2000 grievance. *See Chemsource, Inc. v. Hub Group, Inc.,* 106 F.3d 1358, 1361 (7th Cir. 1997) ("The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond

the pleadings and support its contentions with proper documentary evidence.")

Jackson's claim that he did not receive a response to his grievance until spring of 2001 does not alone raise the inference of race discrimination, and he has offered no evidence that similarly situated white grievants received responses from the Union more promptly. Nor has Plaintiff otherwise challenged the propriety of the Union's conduct. Officials, including the Union's attorney, reviewed his grievance, and each concluded it was not in the best interest of the Union to pursue what they believed to be meritless claims. The Union's letter informing Jackson of its decision advised him that he could appeal its decision to the Union's District Council. Jackson argues that the Union does not prosecute the claims of African-Americans as often as it pursues white employees' grievances, but once again, Jackson has failed to support this assertion with any statistical evidence.

Finally, Jackson has not offered sufficient evidence from which a jury could conclude that the Union's decision to waive the bidding process was racially motivated. Jackson argues that because the Union was aware that there were qualified African-American candidates for the position, its decision to waive the bidding process was discriminatory. But Jackson does not offer evidence showing that Union officials were in fact aware that there were qualified African-Americans. Assuming that they were aware, however, this is not proof of racial animus, for it does not effectively counter the Union's statement that it believed McCarthy was the most qualified applicant. For these reasons, the court grants the Union's motion for summary judgment.

## III.   Jackson's Retaliation Claim Against the City of Chicago

Jackson contends that the City's decision not to promote him in 2000 to the General Foreman position was in retaliation for his filing charges of race discrimination with the EEOC and IDHR stemming from his non-promotion in 1997. In *Stone,* 281 F.3d at 644, the Seventh Circuit explained that a plaintiff claiming retaliation can defeat summary judgment through two methods which are analogous to the ones used to prove racial discrimination described above. One way is to present direct evidence (evidence that establishes without resort to inferences from

circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains. *Id.* Absent any direct evidence of animus on the City's part, Plaintiff must pursue the *McDonnell Douglas* method, adapted to the retaliation context; that is, Jackson must establish a prima facie case of retaliation by showing that: (1) he engaged in statutorily protected activity; (2) he was performing his job in a satisfactory manner; (3) he suffered an adverse employment action; and (4) he was treated less favorably than any other similarly situated employee who did not engage in such protected activity. *Id.*; *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir. 2002).

Viewing the evidence in the light most favorable to Jackson, the court concludes that he satisfies the first three prongs. Filing a claim of discrimination with the EEOC is a protected activity under Title VII. *Franzoni v. Hartmarx Corp.,* 300 F.3d 767, 772 (7th Cir. 2002). The court presumes Jackson was performing his job in a satisfactory manner, since he held the position for several years and there was no indication to the contrary. *Reed v. Manteno School Dist. No. 5,* No. 02-2332, 2003 WL 721725, *3 (7th Cir. Feb. 26, 2003). And a failure to receive a promotion may be considered an adverse employment action. *Stutler v. Illinois Dept. of Corrections,* 263 F.3d 698, 703 (7th Cir. 2001) (citations omitted).

Jackson's claim runs adrift on the fourth prong, however. The court finds no evidence in the record that Jackson was treated less favorably than other similarly situated employees who did not file claims with the EEOC. A similarly situated employee is one who is "directly comparable to [the plaintiff] in all material respects." *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir. 2002). Jackson did not offer any evidence showing that employees who do not file claims with the EEOC are treated more favorably by the City. Probably because Jackson attempts to prove a causation element to establish a prima facie case, he argues that it was "common knowledge" throughout the Department of Transportation that he had complained of race discrimination prior to applying for the General Foreman position (Pl.'s 56.1 ¶ 254), and this is why he did not receive the promotion. Jackson states further that the evidence suggests a "telling temporal sequence," demonstrating

a causal link between protected activity and adverse employment activity. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment at 23.) Temporal proximity between the protected activity and the adverse employment action is rarely adequate to create a triable issue in any event, *Stone,* 281 F.3d at 644, but in this case, the three-year gap between Jackson's 1997 grievance and the City's decision in 2000 is clearly too great to support any causal linkage.

Jackson fails to point to evidence from which a reasonable jury could conclude that he was treated differently than a similarly situated employee who did not complain of race discrimination. When plaintiffs proceeding under the burden-shifting formula of *McDonnell Douglas* fail to produce competent evidence that they were treated differently than similarly situated employees, the court must grant summary judgment on that basis. *Rogers v. City of Chicago,* 320 F.3d 748, 755-56 (7th Cir. 2003).

### CONCLUSION

For the foregoing reasons, the court grants the Union's motion for summary judgement (Doc. No. 17-1). The City's motion for summary judgment (Doc. No. 21-1) is granted with respect to the retaliation claim and denied with respect to Jackson's claims of racial discrimination.

ENTER:

Dated: March 27, 2003

REBECCA R. PALLMEYER
United States District Judge